| | |
|---|---|
| BOARD OF TRUSTEES, NATIONAL SHOPMEN PENSION FUND, ET AL <br><br> Plaintiffs <br><br> vs. <br><br> NORTHERN STEEL CORP., ET AL <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.05-cv-01479 (RWR)

## DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### Statement of Facts

The opposing affidavit of George H. Caruso gives the general history of Northern Steel, the only Defendant who Plaintiff claims was a signatory to an agreement which obligated it to the Plaintiff. That history indicates that the Defendants George Caruso Jr. and Romao Caruso never were shareholders or officers of Northern Steel and that George Jr. never was an employee and that Romao was an employee only from March 1977 to September 1985. That opposing affidavit establishes that although from 1953 until December 28, 1992 George H. Caruso and his two

brothers, Harry and Bill also owned Oswego Amusements, that from December 28, 1992 onward the ownership and the management of the two companies involved different persons, the essence of which is that a younger generation of the Caruso family took over ownership and operation of the business of Oswego Amusements, and that in 1993 the older generation of the Caruso family (George H. then 76 years old, Bill then 72 years old and Mary then 79 years old who had inherited Harry's shares) undertook to close out the business of Northern Steel and retire.

From 1993 until October 2001 when Northern Steel closed its doors, Northern Steel was operated and managed solely by George H., Bill and Mary. The Defendants George Jr. and Romao were not involved except Romao who prepared tax returns and gave financial consulting advice starting in the late 1990's.

From 1993 until April 2004 when the race track was sold, Oswego Amusements was not controlled nor managed by George H. or his brother Bill although they each had a minor interest in that corporation, George H. was the ceremonial Chairman of the Board of Directors and Bill owned 1 % of the stock.

**1.     Northern Steel was never notified by Plaintiff that it was seeking to impose withdrawal liability before this action was commenced.**

The opposing affidavit of George H. Caruso in paragraphs h and i affirms that Plaintiff's alleged notices dated September 30, 2003 and February 10, 2004 were never received. Plaintiff's only proof is by Mr. Higgins in paragraphs 11 and 12 of his declaration, where he asserts that those letters were prepared under said dates, but there is no proof of mailing or delivery. The lack of proof of mailing and delivery is particularly significant in view of the " via certified letter" notation on the top of page one of the September 30, 2003 letter. It is obvious that that letter was not delivered and that is why the February 10th 2004 letter was sent. As to that letter we not only have the affidavit of George H. Caruso, but also the affidavit of Nina Caruso. Again on the top of page 1 of the February 10, 2004 letter there is the notation "via overnight mail" and yet we have no proof of mailing or delivery of it by any carrier.

29 U.S.C. §1139(b)(1) requires "(a)s soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall (a) notify the employer of (i) the amount of the liability, and (ii) the schedule for

liability payments, and (b) demand payment in accordance with the

schedule".

In the 1992 case of <u>Canaria v. Lidelco, Inc.</u>, 782 F Supp. 749, 753,

Judge Amon of the Eastern District of New York, citing two Circuit Court

cases as well as a Massachusetts District of New York case, held that

"compliance with the statutory notice requirements is a prerequisite to

collection on a suit to recover withdrawal liability", and based thereon he

denied Summary Judgement. Likewise, Summary Judgement should be

denied herein.

### 2. Neither Oswego Amusements, Inc. or GDR are Alter Egos of Northern Steel

The facts before the Court on this motion establish that from 1992

until October 2001 when Northern Steel closed, the ownership and

management of both Oswego Amusements and GDR (then known as

Oswego Speedway, Inc.) were substantially different and that neither of

those companies engaged in any business with Northern Steel. (R. Caruso

deposition Exhibit 3 and pp 3l). Prior to 1992, GDR did not exist and

although there were transactions then between Northern Steel and

Oswego Amusements, there was strict financial accountability regarding

such matters (G. Caruso afft. ¶f).

This writer believes that Plaintiff's cited authority of Flynn v. R.C. Tile 353 F. 3d 953, is not applicable because it involved non corporate entitles. Instead the applicable law for corporation entities is that reviewed by the 8th Circuit in Greater Kansas City Laborers Pension Fund v. Superior General Contractors Inc., 104 F. 3d 1050, 1055 which restated the "long-established principle that a corporations existence is presumed to be separate... may be disregarded only under narrowly prescribed circumstances". Such circumstances have not been established by Plaintiff in its moving papers herein.

### 3. The corporate veils of Oswego Amusements and GDR should not be pierced to hold George Caruso, Jr. and Romao Caruso liable.

There is no proof that these corporations were created or operated other than for legitimate business purposes. There is no evidence before the Court on this motion which as a matter of law would justify the Court in finding all of the facts necessary to justify piercing the veils of said corporations. The fact that GDR is the custodian presently of cash assets of both Northern Steel and Oswego Amusements does not justify such a finding. If and when Plaintiff recovers a judgment against either Northern Steel or Oswego Amusements, GDR will turn over such assets upon a proper demand.

**4.  GDR, Romao Caruso and George Caruso, Jr. are not liable under the Corporate Trust Doctrine.**

There is no proof that the assets of Northern Steel or Oswego Amusements have been transferred to GDR, Romao Caruso or George Caruo, Jr. The proof is that GDR holds as a fiduciary for Northern Steel and Oswego Amusements particularized monies resulting from the liquidation of certain assets of each corporation. (R. Caruso Dep. pp. 46-7). In any event there is no basis in the record for Plaintiff to claim entitlement to any of the assets of Oswego Amusements, Inc.

Dated: April 27, 2007

DIRK J. OUDEMOOL, ESQ.
(Pro hac vice)
Attorney for Defendants
Address and PO Box
333 East Onondaga Street
Syracuse, New York l3202
Phone: 315-474-7447
Fax: 315-474-0425

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

BOARD OF TRUSTEES,                    )
NATIONAL SHOPMEN PENSION FUND,        )
ET AL                                 )
                                      )
            Plaintiffs                )
                                      )
        vs.                           )  Civil Action No.05-cv-01479
                                      )                    (RWR)
NORTHERN STEEL CORP., ET AL           )
                                      )
            Defendants                )
                                      )
_____)

DECLARATION OF DIRK J. OUDEMOOL, ESQ.

I, Dirk J. Oudemool, Esq., pursuant to 28 U.S. C. §1746, declare:

1.      I am one of the attorneys for the Defendants in this case.

2.      Attached to this declaration are true and correct

copies of pages 16-23, 30, 32, 42-47, 53, 66 and 67 of the transcript of the

deposition of Romao J. Caruso, taken in this case on October 20, 2006,

which were not attached to Mr. Swyers declaration and are referred to in

the Defendants opposing papers.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed this **29** day of April, 2007, in Syracuse, New York.

_____

Dirk J. Oudemool, Esq.

1

2      A.    Correct.

3      Q.    And the three brothers, which includes your

4   father, owned and operated that business until 1992,

5   when your brothers were gifted your father's ownership

6   interest in that business --

7      A.    Correct.

8      Q.    -- is that correct?

9      A.    That's correct.

10      Q.    Prior to you and your brothers coming on board

11   as owners of the speedway, and I'm referring not to the

12   corporation, I'm just referring to the business at this

13   point, running the speedway, prior to that time do you

14   know whether or not Northern Steel gave any money or any

15   money from Northern Steel went toward the operation of

16   that speedway?

17      A.    Oswego Amusements?

18      Q.    Yes, sir.

19      A.    Yes, there was -- there was.  At times

20   employees went up and did some work from Northern Steel

21   to the -- to the speedway under Oswego Amusements.

22   There was times there was probably steel that was, you

23   know, that was sent up there from Northern Steel.  But,

24   you know, to the best of our ability we tried to accrue

25   that on the books, and that's where, going back to this

1

2   Exhibit 1, this is where that 500,000 comes from.

3        Q.   Okay.

4        A.   Okay.   That is a carryover from the old Oswego

5   Amusements that was on the books when my brothers and I

6   took over as Oswego Amusements, and, you know, on the

7   advice of counsel we formalized the loan with a note --

8        Q.   Okay.

9        A.   -- in October of 2000.

10       Q.   Okay.   Let me -- I'm trying to try to -- I'll

11  work up to that, but that connects it.   So let's talk

12  about Oswego Amusements, Inc., which prior to round

13  abouts 1992 was the only corporate entity that was

14  running things, running this speedway?

15       A.   Involved with the speedway, yeah.

16       Q.   So prior to that time you just said that there

17  was -- you mentioned employees and some equipment, but

18  let me try, to the best of your knowledge, flesh that

19  out.   When you said that employees from Northern Steel

20  went over to the speedway, what did you mean by that?

21       A.   Probably make repairs.   If the wall had been

22  broken, they went over to make repairs.   I think on a

23  couple of occasions they may have done some work on the

24  grandstands, that type of thing.

25       Q.   Okay.   And these were employees of

1

2    Northern Steel that were on Northern Steel's payroll,

3    correct?

4        A.    That's correct.

5        Q.    In terms of, you know, running the concessions

6    or working there on Saturdays or Sundays, did any

7    employees from Northern Steel --

8        A.    Everybody that worked on a Saturday night was

9    an employee of Oswego Amusements, Incorporated --

10       Q.    So when you say --

11       A.    -- including myself.

12       Q.    So when you say that employees of

13   Northern Steel went over to Oswego Amusements, Inc.,

14   you're talking about basically providing services

15   insofar as -- well, did they do any cleaning?

16       A.    No.

17       Q.    During the week it was mostly of a repair

18   type of nature?

19       A.    Something needed to be repaired, something

20   needed to be welded, grandstands needed to be fixed,

21   something along those lines, it was just practical to

22   have somebody from Northern Steel do it.

23       Q.    Okay.

24       A.    And we tried to track it as best we could and

25   keep track of it on an accrual basis, accrual amounts.

1

2    Q.    When you say we, is this after the fact when

3    you and your two brothers came on board?

4    A.    No, this would be -- this would be as it

5    happened throughout, throughout the period of time,

6    prob -- probably -- maybe from when I got on board as a

7    of comptroller through the time that Frank Bellso did

8    the accounting.

9    Q.    Okay.  So you're saying that while you were --

10   and again I'm focusing here on pre-1992.

11   A.    Yes.

12   Q.    So pre-1992 -- well, pre-1992, you know, is

13   certainly when you were there as a comptroller or as a

14   tax person or as an employee of Northern Steel?

15   A.    Mm-hmm.

16   Q.    You say you all tried to do something on the

17   books with respect to the services that Northern Steel

18   was providing to Oswego Amusements, Inc.?

19   A.    Correct.

20   Q.    Okay.  And let's get the extent of what was,

21   you know, the services or whatever.  I mean did

22   employees from Northern Steel go over to do repair work,

23   was that a weekly type of thing?

24   A.    Well, in the summertime probably it was, yeah,

25   while the track was in -- while the track was operating,

2   yeah, I would say it was pretty much week to week,

3   depending on what needed to be done.

4       Q.    Okay.  And so I'm assuming that -- I shouldn't

5   assume, let me just ask, did Northern Steel bill Oswego

6   Amusements, Inc. for that work, or for those jobs?

7       A.    There was no formal business -- no invoices

8   made out.

9       Q.    Okay.

10      A.    We tracked it the best we could through the

11  markings on the invoices as they came in, and then we

12  also knew who went up to the track and when, and we

13  would track it through payroll the best we could.  But,

14  no, there were no formal invoices paid or sent to Oswego

15  Amusements.

16      Q.    And you said you tried to do something to

17  track it on the books, what?

18      A.    Well, the accounts payable secretary, I'd ask

19  her that if there was materials purchased for Oswego

20  Amusements, to put like OA on the invoice or --

21      Q.    What does OA mean?

22      A.    OA's Oswego Amusements.

23      Q.    Oswego Amusements, I'm sorry.

24      A.    Or on the check stub, and the payroll

25  department, we'd -- if there was somebody that had gone

up to the speedway and done some work, we tried to give

that a code, a code like a number or something so that I

could, at the end of the year, end of six months,

whenever we did a financial statement, we could identify

it, you know, that type of thing.

    Q.    Okay.  But I mean basically Northern Steel

made no money off of the work that it did --

    A.    No.

    Q.    -- that it did and its employees did --

    A.    No.

    Q.    -- at Oswego Speedway?

    A.    Oswego Amusements, no.

    Q.    And on the books was it -- I'm talking now

pre-1992, did it show up as -- as a receivable or

anything like that at that time?

    A.    What's that?  Yeah, it showed up as, you know,

basically a loan from, you know --

    Q.    Okay.

    A.    -- a loan to that, like an intercompany loan

type of thing.

    Q.    Okay.  Showed up as a loan?

    A.    Yeah.

    Q.    But at that point in time there was no formal

written loan agreement; is that correct?

1

2          A.    Not at that time, no.

3          Q.    And no formal --

4          A.    No, because it was an ongoing thing and, you

5    know, to lock in on a number, you know --

6          Q.    And there probably wasn't an expectation as

7    far as, you know, of repayment, was there?

8          A.    There was.  I do remember we did do some

9    offsets for Oswego Amusements, giving like tickets or

10   something to Northern Steel to give out.  You know, like

11   if my father or Harry or Bill wanted to give out

12   tickets, we would -- we would kind of count that against

13   the other.  So it was just a constant in and out

14   transaction type thing.

15         Q.    Between the two companies?

16         A.    Yes.

17         Q.    I don't understand the ticket things I guess.

18   I mean are you saying that Oswego Amusements, Inc. might

19   give out free tickets, or your father might give out

20   free tickets on behalf of Northern Steel?

21         A.    Mm-hmm.

22         Q.    I don't mean to put words in your mouth, I

23   don't understand the ticket, the ticket thing basically.

24         A.    If he gave out $100 worth of tickets, that

25   would -- that would go against the -- the loan

1

2    receivable, so it would actually reduce the loan

3    receivable.

4         Q.    Because it would somehow be figured out he was

5    giving out those tickets on behalf of Northern Steel --

6         A.    Right.

7         Q.    -- to employees or customers?

8         A.    Mm-hmm.

9         Q.    I guess that would -- that was looked upon as

10   advancing the interests of Northern Steel?

11        A.    Yeah, absolutely, to give them to purchasing

12   agents or that type of thing.  So on the one hand it was

13   a promotional expense to Northern Steel, on the other

14   side it was income to Oswego Amusements, and it offset

15   the -- the accrual that was on the books, so it would

16   actually reduce the loan receivable on the books of

17   Northern Steel.

18        Q.    But again, at least prior to, you know, prior

19   to, I guess, some of these notes that we're going to

20   talk about, there was no written agreement between the

21   two companies?

22        A.    No.

23        Q.    It was just --

24        A.    No, there was no written agreement.

25        Q.    They just did what you're describing?

1  whether -- whether any of that money was ever paid back?

2

3      A.    There was a few payments made, but shortly

4  after we took over the racing industry really took a

5  dive, so we were just struggling to keep things going on

6  a weekly basis, let alone year to year.

7      Q.    So there was really no pressure for Oswego

8  Amusements, Inc. to pay off that note to Harry?

9      A.    Well, obviously it's out there, but, you know,

10  we just didn't have the money to do it, plain and

11  simple.

12     Q.    Okay.  So the three brothers come in.  They

13  establish Oswego Speedway, Inc., I guess through the --

14  your dad gifted his shares of Oswego Amusements, Inc. to

15  his three sons?

16     A.    Correct.

17     Q.    So your uncle, who had the most interest I

18  guess in terms of shares, got a note, so he's out.  So

19  this allowed the three brothers to come into Oswego

20  Amusements, Inc., who are basically pretty much holding

21  all the stock, I guess, except for a small bit?

22     A.    One share.

23     Q.    Owned by William?

24     A.    That's correct.

25     Q.    Okay.  Subsequent to -- we talked about

2    all -- I haven't been there, but I mean in terms of the

3    grandstands, were they basically steel bleachers on

4    girders or --

5        A.    Yeah, basically, yeah.  Yes, that's -- but,

6    again, I'm -- we're looking at the -- I mean as far as

7    that's concerned, that's from the time I came to

8    basically till the time it was separated.  Whatever

9    happened before 1977 I'm not sure.

10       Q.    Before 1977 when you were --

11       A.    Right.

12       Q.    Because what I was going to ask is did

13   Northern Steel actually build those grandstands, if you

14   know?

15       A.    I'm not sure.

16       Q.    Okay.

17       A.    You know, I'm not sure --

18       Q.    Okay.

19       A.    -- if they actually built them.  I know at the

20   time that I was involved, they were going up and making

21   repairs and doing things to them.

22       Q.    So in terms of how much of the material that

23   composed the walls and the grandstand came from

24   Northern Steel you can't really answer that question?

25       A.    I'm not sure.

1

2      Q.    Okay.   Can you tell me the circumstances which

3   led to Exhibit 2?

4      A.    Yeah.   The time line, event time line of

5   events, Paragraph 16 breaks it down as to what

6   transpired.

7      Q.    At that time?

8      A.    Yeah.

9      Q.    Okay.   Well, let's -- I'm going to refer --

10  for the record we're going to be talking about

11  Paragraph 16 on Exhibit 3, and I'll read it into the

12  record.  2003, it says on June 10, 2003, Northern Steel

13  Corp. sells its machinery and equipment at auction by

14  Koster Industries for $301,060.  Koster receives a

15  20 percent commission of $60,212.  Balance of sale

16  totaling 240,848 is deposited in GDR Enterprises of

17  Oswego, Inc. savings account because the Northern Steel

18  checking account was closed.  Loan receivable balance at

19  3/31/04 from Oswego Speedway, Inc. is calculated as

20  follows.  Okay.

21      And you have down there a demand note.  I was

22  reading this and trying to figure out what this had to

23  do with the note we were just talking about, about what

24  the relationship of Paragraph 16 to the -- of Exhibit 3

25  to the demand note that we were talking about here --

1

2      A.   Right.

3      Q.   -- is simply that you noted at the end of,

4   because this happened in 2003, a demand note for

5   $171,176.11 was taken by Northern Steel Corp., taken

6   back?

7      A.   Right.

8      Q.   I'm going to ask you about 16 on Exhibit 3,

9   but I'm going to keep talking about the demand note

10  first and then go back to that if that's okay.

11     A.   Okay.

12     Q.   You've already told me why and what

13  precipitated the -- strike that.  Exhibit 2, the demand

14  note for $176,171, did you create that, draft that

15  yourself?

16     A.   Yes, I did.

17     Q.   And we've already talked about Exhibit 1, the

18  first demand note.  What caused or precipitated you to

19  do this demand note?

20     A.   As you see in Paragraph 16 there's a

21  calculation made as to what was deposited in the

22  Oswego -- or, I'm sorry, now GDR Enterprises, Oswego

23  Speedway, Inc., or GDR.  And the events that -- the

24  financial events that transpired after the deposit, and

25  there -- and the situation is that basically after the

1    1st of what, January of 2002, all the -- all the

2    accounts of Northern Steel Corporation were closed, and

3    basically we've been tracking any earnings of

4    Northern Steel through the other corporation.

5        Q.    What's the name of that corporation, GDR

6    Enterprises?

7        A.    Yes.    Starts out as Oswego Speedway,

8    Incorporated, later changed to GDR Enterprises of

9    Oswego.

10       Q.    Okay.  So that money was deposited into the

11   GDR, the Oswego Speedway, Inc. account, and the note was

12   taken back to track the, you know, the fact that that

13   was Northern Steel monies.  So you got GDR, all right, I

14   get it now, I understand.

15           First of all Oswego Amusements, Inc., I

16   understand that GDR Enterprises of Oswego, Inc. was what

17   used to be Oswego Speedway, Inc. --

18       A.    Correct.

19       Q.    -- am I correct in that?

20       A.    Yes.

21       Q.    Oswego Speedway, Inc. is what ran the

22   racetrack operations after you and your brothers took

23   over --

24       A.    That's correct.

Q.    -- ownership operating --

A.    That's correct, yeah.

Q.    -- Oswego Amusements, Inc. and the speedway facilities?

A.    Yes.

Q.    What happened to Oswego Amusements, Inc.?

A.    Oswego Amusements, Inc., I mean it's -- it's still an active corporation.  Really didn't -- for the last several years it really didn't do anything.  We didn't have enough money to pay the lease, so basically it just sat there until the real estate was sold on April 1st of 2004.

Q.    Okay.  Now, it's not on -- I see here there's some money sitting in here, at least as of 2003 there was money sitting in the GDR Enterprises account.  But other than that is GDR Enterprises any more active a corporation than Oswego Amusements, Inc. at this point?

A.    Right now the only thing that GDR does is pay the Blue Cross, Blue Shield premiums on behalf of Northern Steel, and that is being offset against this loan receivable.  So the loan receivable is coming down each year.

Q.    Okay.

A.    But other than that --

1

2        Q.    Other than that --

3        A.    -- there's no other activity.

4        Q.    So really -- well, so really the only activity

5   of GDR Enterprises of Oswego, Inc. right now is to

6   basically hold the money of Northern Steel Corp. and pay

7   off the Blue Cross, Blue Shield -- did you say premiums?

8        A.    Yeah, insurance premiums.

9        Q.    I mean that's pretty much its, GDR

10  Enterprises' only activity right now, is that fair to

11  say?

12       A.    That's the only thing that's going through the

13  checking account I guess.

14       Q.    Okay.    That's  -- okay.    Why are you all doing

15  that through GDR Enterprises of Oswego as opposed to

16  Oswego Amusements?

17       A.    Because that's the only account that we've got

18  left.    Northern Steel's were closed, Oswego Amusements

19  were closed.    I just didn't feel like trying to keep

20  track of three or four different checking accounts --

21       Q.    Sure.

22       A.    -- when I could do it through this and just

23  track the loan activity.

24       Q.    So back to the note.    So the purpose or the

25  reason why the note that we see in Exhibit 2 was done is

1

2    because some money came into -- wait a minute.  All

3    right.  The $171,176.11 that's on Note 2, it's on the

4    demand note which is marked as Exhibit 2, represents, I

5    think is what you've just explained to me, the amount

6    that you describe and state in Exhibit 3 Paragraph 16,

7    correct?

8        A.    That's correct.

9        Q.    Okay.  And what the money -- the $171,176.11

10   in Paragraph 16 of Exhibit 3 comprises is money that has

11   come into the account of GDR Enterprises, money that was

12   deposited, money that -- Northern Steel's money that was

13   deposited in the account of GDR Enterprises of Oswego,

14   correct?

15       A.    Correct.

16       Q.    Because when money came in, Northern Steel

17   didn't have a bank account, and so it was placed in

18   GDR Enterprises of Oswego's bank account; is that

19   correct?

20       A.    That's correct.

21       Q.    Okay.  So here's the question for you.  If

22   this money is in GDR Enterprises of Oswego's bank

23   account, then why is the demand note to Oswego Speedway,

24   Inc.?

25       A.    That's because I put it under Oswego -- they

1

2      Q.    So I guess prior to 1992 the corporate

3    offices, or the offices of Oswego Amusements, Inc. were

4    in the same building as Northern Steel?

5      A.    Right, because there was no office space

6    there.

7      Q.    Okay.

8      A.    The office post '92 was an office that my

9    brothers and I put together.  And prior to that it

10   actually was -- it was a restaurant there on the

11   speedway grounds, whatever.

12     Q.    Pre 1992 when the Oswego Amusements, Inc. had

13   an office at the Northern Steel premises, there

14   wasn't -- to your knowledge there wasn't any type of

15   lease arrangement or rent arrangement?

16     A.    No.

17     Q.    Was it the same phone number?  Did the

18   speedway have a different phone number?

19     A.    No, different line came in.

20     Q.    And as far as you know prior to 1992 this

21   secretary lady and then the three or four maintenance

22   guys, were they on a separate payroll?  They weren't on

23   Northern Steel's payroll?

24     A.    They were on Oswego Amusements' payroll.

25     Q.    Okay.  That's pre 1992.  What happened post

Q.    And the check was out of Oswego Amusements,

Inc. --

A.    Yes.

Q.    -- payroll?

A.    Yeah.

Q.    Now --

A.    Along with what I did on Saturday night at

the racetrack.

Q.    At the racetrack?

A.    Yeah.

Q.    Now, prior to 1992, or prior to when -- when

actually did you and your brothers build the office for

Oswego Amusements, Inc. and Oswego Speedway, Inc.?

A.    I believe it was -- well, that's a good

question.  It was like in -- I think it was 19 -- I

think we started it -- I think we started it in like

January of 1991 and finished it -- I think we finished

it that fall, fall of 1991 I believe.

Q.    Okay.  So from the date that you guys took

over ownership operation of Oswego Amusements, Inc.,

from the date that you guys took that over, on the date

that you took that over, did Oswego Amusements, Inc.

have office in Northern Steel?

A.    No.  When we took it over, we were at our new

1    location.

2         Q.    Okay.

3         A.    We were at the track.  We never operated

4    Oswego Amusements or Oswego Speedway out of the

5    364 East Ave. location.  And the new deal --

6         Q.    Do you know when Oswego Amusements, Inc. moved

7    out of its East Ave. location?

8         A.    It would have been the same time, fall --

9         Q.    Same time?

10        A.    Fall of -- yeah, we, ran it -- were basically

11   running both businesses simultaneously.

12        Q.    So prior to 1992, what we've been talking

13   about, so prior to 1992, Oswego Amusements, Inc.

14   corporate records, business records, accounting records

15   were all kept at the East Ave. address?

16        A.    That's correct.

17        Q.    Which is also where Northern Steel Corp.

18   offices were?

19        A.    Exactly.

20        Q.    Okay.  And then subsequent to that they

21   actually -- you moved to an office that was at the

22   racetrack?

23        A.    At the racetrack.

24        Q.    And then its corporate records were kept there

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BOARD OF TRUSTEES,                          )
NATIONAL SHOPMEN PENSION FUND,              )
ET AL                                       )
                                            )
                Plaintiffs                  )
                                            )
        vs.                                 )    Civil Action No.05-cv-01479
                                            )                    (RWR)
NORTHERN STEEL CORP., ET AL                 )
                                            )
                Defendants                  )
                                            )
_____            )

STATEMENT OF DISPUTED
MATERIAL FACTS

The Defendants hereby submit the following statement of Disputed

Material Facts in opposition to the Plaintiff's motion for Summary

Judgment:

By way of clarification for the Court, the Defendants agree that

paragraphs 1, 2, 3, 4,5, 9, 10, 17, 19, 20, 21, and 24 of Plaintiff's

Statement of Undisputed Material Facts are in fact undisputed. However,

Defendants assert that all other paragraphs thereof contain material facts

which are disputed. The Defendants assert herein the Defendants version

of those disputed facts and cite the support in the record before the Court
wherein the Defendants proof of those facts is contained.

1.    The Plaintiff's letter of September 30, 2003 directed to the

Defendant Northern Steel at 364 East Avenue, Oswego, New York

advising Northern Steel of withdrawal liability to the Plaintiff, was not

delivered to nor received by Northern Steel. (G. Caruso Afft.¶ i)

2.    The Plaintiff's letter of February 10, 2004 directed to the

Defendant Northern Steel c/o George H. Caruso at his residence located at

255 Syracuse Avenue, Oswego, New York, advising Northern Steel of

withdrawal liability to the Plaintiff, was not delivered to or received by

George H. Caruso. (G. Caruso Afft.¶ h  and N. Caruso Afft. ¶ 2)

3.    The Defendants Northern Steel and Oswego Amusements,

from December 28, 1992 until the present have  had different

shareholders.  (G. Caruso Afft. ¶ a & b and R. Caruso Dep. Ex. 3)

4.    The Defendant Northern Steel and the Oswego Amusements,

from March 1, 1994 until the present have had different officers. ( R.

Caruso Dep Ex.3)

5.    The Defendant Northern Steel and the Defendant Oswego

Amusements, have operated out of different addresses since December

15, 1992. (R. Caruso Dep.  pp. 53, 66 & 67)

6. Over the years that Northern Steel provided workers and

materials to Oswego Amusements, Northern Steel and Oswego

Amusements each acknowledged on their federal tax returns that Oswego

Amusements was indebted to Northern Steel for the value of said workers

and materials. (G. Caruso Afft. ¶ f and R Caruso Dep. pp.16-23)

7. Oswego Amusements has made some payments on the

$650,000 note for the redemption of Harry Caruso's shares of stock. (R.

Caruso Dep. p. 30)

8. George H. Caruso was president of Oswego Amusements from

April 1951 until March 1, 1994 when he was elected Chairman of the Board

of Directors, a position he continues to hold today. (G. Caruso Afft. ¶ b and

R.Caruso Dep. Ex. 3)

9. On June 10, 2003 when Northern Steel auctioned its machinery

and equipment it did not have a bank account and therefore the proceeds

of $240,848 were deposited into the bank account of Oswego Speedway,

Inc., as a fiduciary for Northern Steel. (R. Caruso Dep. pp. 42-47and G.

Caruso Afft. ¶ g)

10. On April 1, 2004 when Oswego Amusements sold the Oswego

Speedway it did not have a bank account and the net proceeds of sale in

the amount of $344,083.45 were deposited into the bank account of

Oswego Speedway, Inc., as a fiduciary for Oswego Amusements. (R.

Caruso Dep. p. 46)

Dated: April 25, 2007

DIRK J. OUDEMOOL, ESQ.
(Pro hac vice)
Attorney for Defendants
Address and PO Box
333 East Onondaga Street
Syracuse, New York l3202
Phone: 315-474-7447
Fax: 315-474-0425

| | |
|---|---|
| BOARD OF TRUSTEES,<br>NATIONAL SHOPMEN PENSION FUND,<br>ET AL | ) <br> ) <br> ) <br> ) |
| Plaintiffs | ) <br> ) |
| vs. | ) Civil Action No.05-cv-01479<br> ) (RWR) |
| NORTHERN STEEL CORP., ET AL | ) <br> ) |
| Defendants | ) <br> ) <br> ) |

## OPPOSING AFFIDAVIT

George H. Caruso, being duly sworn, deposes and says:

a.    I am a shareholder of Northern Steel Corporation and have been a shareholder of that corporation since it was formed in 1953 by my brothers Harry, Bill and me. I also am the last elected president of this corporation having acquired that position in the early 1990's upon the incapacitation of my brother Harry, who had served as president from the inception of the company. I am 89 years of age having been born on May 15, 1917, Harry was 82 years of age when he died on July 30, 1993, and Bill today is 85 years of age having been born on July 31, 1921.

b.    I am a former shareholder of Oswego Amusements Inc., which company I was an owner of from 1951 until December 28, 1992 when I gifted all of my shares to my three sons George, Jr., Douglas and Romey. I was the president of Oswego Amusements, Inc. from its inception until March 1, 1994 when George Jr. became the president and I was elected to the ceremonial office of Chairman of the Board of Directors.

c.    Northern Steel in its "hay day" was a very busy company and had as many as 110 employees. As the years passed the business volume and profitability diminished such that beginning in 1985 it experienced a significant decline and at the time of Harry's incapacitation which occurred in 1989 -1990 due to Alzheimer disease, the company's employees had reduced to approximately 25, and the company was losing money. Upon Harry's death and the inheritance of his shares by our sister Mary who was born on November 12, 1912, Bill, Mary and I decided it was time to get out of business and enjoy what years we each had left. Pursuant to that agreement we began to seek buyers for the business of Northern Steel and its assets.  In the same time frame, I came to the conclusion that the race track, which was the sole business of Oswego Amusements and which had been an avocation of the three of us, would not have any chance of surviving unless it was taken over and operated by the younger generation of our family. Bill's children were not interested, Harry had no children nor did Mary and therefore it was up to my boys to carry on, and that was why we redeemed Harry's shares in Oswego Amusements on July 1, 1991 and I  gifted my shares to my boys in December of 1992. On May 6, 1993 Oswego Amusements, Inc. entered into a lease with Oswego Speedway Inc., a corporation wholly owned by my sons to operate the Oswego Speedway.  From that day forward until the speedway was sold on April 1, 2004, my sons were in control of Oswego Amusements Inc. and operated the speedway through their corporation, Oswego Speedway Inc. Neither Bill nor I, during that period, exercised any management responsibilities although Bill was a 9% owner of Oswego Amusements and I was the ceremonial chairman of its Board of Directors.

d.    Our efforts to sell Northern Steel were unsuccessful. We had only two potential purchasers, but neither purchaser closed their contracts of purchase and by October of 2001 the operational losses of the business had exceeded $2,200,000.00 which I partially covered by loaning over $340,000.00 to the company.  Therefore, Bill, Mary and I decided it was time to terminate the Northern Steel  business and liquidate its assets. By this time, the real estate taxes on all of the property of Northern Steel were unpaid to the extent of $265,000.00 and on or about January 20, 2004 the County of Oswego foreclosed on the properties and the corporation no longer owned the business premises.

e.    My son Romey was the only one of my children who ever worked at Northern Steel. He worked at Northern Steel from March of 1977 until September of 1985 as comptroller  when he quit.  Romey did not prepare any tax returns for Northern Steel until late in the 1990's. Until then even when Romey was the comptroller, the accounting firm of Fagliarone & Associates, CPA's prepared all tax returns and performed audits or reviews of Northern Steel. Since the late 1990's Romey has performed accounting and financial consulting services for Northern Steel.

f.    Through the years from 1951 to 1992 when my brothers and I were the sole owners, officers and directors of Northern Steel and Oswego Amusements there were intercompany transactions. These transactions were booked as they occurred and reported on each company's tax returns and were reflected annually on each company's tax returns as either a note receivable or a note payable. There was no formal agreement regarding those transactions, as between Harry, Bill and I, we agreed that when and if funds were available in one company and the other company needed funds which were not otherwise available the notes would be called and a payment made. Over the years, substantial payments were made on those running balances. We employed strict financial accounting for each company which was annually audited or reviewed by the CPA's. There was no informality employed in these intercompany transactions other than there was no profit mark up billed by either company to the other.

g.    On April 4, 2002, Northern Steel closed out its last bank account and therefore when the machinery and equipment was sold on June 10, 2003 there was no Northern Steel bank account into which the proceeds of that sale could be deposited and therefore I authorized Romey to deposit the funds in any account that was available to him, so as any future Northern Steel expenses or income was received as a part of the liquidation that all of those transactions could be handled through his office.

h.    I have reviewed the attached letter from National Shopmen Pension Fund dated February 10, 2004 which is addressed to me at my home address. I have never before seen this letter and state that it was not received at my house. If it had been received I would have immediately turned it over to Romey who was then helping me to wrap up the affairs of Northern Steel.

i.    I have also reviewed the attached letter from the same Pension Fund addressed to Northern Steel at the former business address. As of September 30, 2003, Northern Steel had been out of business for almost 2 years and there was no one at 364 East Avenue, Oswego, New York to receive mail. I note that the letter is marked "via certified mail." If it was delivered to someone, where is the receipt? This letter was never delivered to me or any other person on behalf of Northern Steel.

Sworn to before me
this 27th day of April, 2007

Notary Public

JASON C. RINOLDO
Notary Public, State of New York
Appointed in County of Oswego
No. 01RI5050952
Commission Expires  10-23-09

**National Shopmen Pension Fund**

Suite 701  •  1750 New York Avenue, N.W. Washington, D.C. 20006-5301
Telephone No: (202) 383-4874  •  Fax No. (202) 628-6469

## VIA CERTIFIED MAIL

September 30, 2003

Northern Steel Corporation
364 East Avenue
Oswego, NY 13126

Re:  Withdrawal Liability Determination and Demand for Payment:  Employer No. 450, SLU No. 612

Dear Sir or Madam:

The Trustees of the National Shopmen Pension Fund (hereafter "Fund") hereby notify you of Northern Steel Corporation's withdrawal liability to the Fund and demand payment thereof.  The Fund's records indicate that Northern Steel Corporation withdrew from the Fund as of October 2001.

The Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, requires that withdrawal liability be assessed against contributing employers who withdraw from the Fund after September 26, 1980 (29 U.S.C. Section 1381).  Withdrawal liability is determined by allocating a portion of the Fund's unfunded vested benefits ("UVBs") to the withdrawing employer pursuant to one of the methods authorized by ERISA. The method adopted by the Trustees of the Fund is the "attributable rule".  A withdrawn employer's liability under the attributable rule is the sum of:  (1)  the difference between the UVBs of its employees and its allocated share of the Fund's assets; and (2)  a proportional share of the Fund's UVBs that are not allocated to any contributing employer.  The Trustees of the Fund have directed the Fund's actuaries, The Segal Company, to calculate Northern Steel Corporation withdrawal liability.  The amount of the liability has been determined to be $5,397,100.  A copy of their assumptions used in this calculation is enclosed.

ERISA requires the Trustees to establish a schedule for the payment of withdrawal liability.  Annual payments are based on a statutory formula and are to be paid in equal monthly installments (with interest at an annual rate of 7.5%) over a period of years necessary to amortize the liability.  Northern Steel Corporation's repayment schedule, therefore, is as follows:  Employer is to pay $2,832.00 per month for 240 months.  The Fund hereby demands that you begin payment in accordance with the schedule no later than October 30, 2003.  This repayment schedule will result in a total payment of only $679,680 of the full withdrawal liability. ERISA Section 4219 (c)(1)(B) limits the liability of the company to a twenty-year repayment plan. Accordingly, your company is not obligated to pay the full amount of the liability.  You may, if you wish, pay the entire amount due, without penalty.  Payments must be made notwithstanding any request for review of the withdrawal liability.

Document #: 17349

EXHIBIT

B

A withdrawn employer may, no later than 90 days after receipt of this letter, request a review of the determination, identify any inaccuracy in the Fund's determination of withdrawal liability which may exist, or furnish additional relevant information.

This letter constitutes notice of the withdrawal liability to Northern Steel Corporation. and all groups of trades or businesses under common control or common ownership with Northern Steel Corporation. The Fund hereby demands that you provide within 30 days the names, addresses, and officer names of any and all corporations, companies or entities within the common control group of Northern Steel Corporation or under common ownership of the stockholders of Northern Steel Corporation. Northern Steel Corporation is required to provide this information to the Fund within 30 days by 29 U.S.C. Section 1399.

If the Fund is required to bring suit to collect withdrawal liability, the withdrawn employer also becomes liable for interest, liquidated damages (in the amount of 20% of the amount due), and all costs of collection, including attorneys' fees.

We trust that payments will begin as scheduled. If you have any questions about this matter, do not hesitate to contact the Fund Office.

Sincerely,

A.H. Higgs, Jr.
Administrator

AHH/jw
enclosure
cc: Marc Rifkind, Fund Counsel
     SLU #612

Document #: 17349

*Corr*

# National Shopmen Pension Fund

Suite 400 • 1750 New York Avenue, N.W. Washington, D.C. 20006-5301
Telephone No: (202) 383-4874 • Fax No. (202) 628-6469

**VIA OVERNIGHT MAIL**

February 10, 2004

Northern Steel Corporation
c/o George H. Caruso
255 Syracuse Avenue
Oswego, NY 13126-3130



RECEIVED
FEB 11 2004

<u>Re: Withdrawal Liability Determination and Demand for Payment: Employer No. 450, SLU No. 612</u>

Dear Sir or Madam:

The Trustees of the National Shopmen Pension Fund (hereafter "Fund") hereby notify you of Northern Steel Corporation's withdrawal liability to the Fund and demand payment thereof. The Fund's records indicate that Northern Steel Corporation withdrew from the Fund as of October 2001.

The Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, requires that withdrawal liability be assessed against contributing employers who withdraw from the Fund after September 26, 1980 (29 U.S.C. Section 1381). Withdrawal liability is determined by allocating a portion of the Fund's unfunded vested benefits ("UVBs") to the withdrawing employer pursuant to one of the methods authorized by ERISA. The method adopted by the Trustees of the Fund is the "attributable rule". A withdrawn employer's liability under the attributable rule is the sum of: (1) the difference between the UVBs of its employees and its allocated share of the Fund's assets; and (2) a proportional share of the Fund's UVBs that are not allocated to any contributing employer. The Trustees of the Fund have directed the Fund's actuaries, The Segal Company, to calculate Northern Steel Corporation withdrawal liability. The amount of the liability has been determined to be $5,397,100. A copy of their assumptions used in this calculation is enclosed.

ERISA requires the Trustees to establish a schedule for the payment of withdrawal liability. Annual payments are based on a statutory formula and are to be paid in equal monthly installments (with interest at an annual rate of 7.5%) over a period of years necessary to amortize the liability. Northern Steel Corporation's repayment schedule, therefore, is as follows: Employer is to pay $2,832.00 per month for 240 months. The Fund hereby demands that you begin payment in accordance with the schedule no later than March 11, 2004. This repayment schedule will result in a total payment of only $679,680 of the full withdrawal liability. ERISA Section 4219 (c)(1)(B) limits the liability of the company to a twenty-year repayment plan. Accordingly, your company is not obligated to pay the full amount of the liability. You may, if you wish, pay the entire amount due, without penalty. Payments must be made notwithstanding any request for review of the withdrawal liability.

Document #: 17349



EXHIBIT
C

A withdrawn employer may, no later than 90 days after receipt of this letter, request a review of the determination, identify any inaccuracy in the Fund's determination of withdrawal liability which may exist, or furnish additional relevant information.

This letter constitutes notice of the withdrawal liability to Northern Steel Corporation. and all groups of trades or businesses under common control or common ownership with Northern Steel Corporation. The Fund hereby demands that you provide within 30 days the names, addresses, and officer names of any and all corporations, companies or entities within the common control group of Northern Steel Corporation or under common ownership of the stockholders of Northern Steel Corporation. Northern Steel Corporation is required to provide this information to the Fund within 30 days by 29 U.S.C. Section 1399.

If the Fund is required to bring suit to collect withdrawal liability, the withdrawn employer also becomes liable for interest, liquidated damages (in the amount of 20% of the amount due), and all costs of collection, including attorneys' fees.

We trust that payments will begin as scheduled. If you have any questions about this matter, do not hesitate to contact the Fund Office.

Sincerely,

A.H. Higgs, Jr.
Administrator

AHH/jw
enclosure
cc: Marc Rifkind, Fund Counsel
    SLU #612

Document #: 17349

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
BOARD OF TRUSTEES,                    )
NATIONAL SHOPMEN PENSION FUND,        )
ET AL                                 )
                                      )
                  Plaintiffs          )
                                      )
         vs.                          )     Civil Action No.05-cv-01479
                                      )                       (RWR)
NORTHERN STEEL CORP., ET AL           )
                                      )
                  Defendants          )
                                      )
_____)
```

## OPPOSING AFFIDAVIT

Nina B. Caruso being duly sworn deposes and says:

1.      I am the wife of George H. Caruso and we have lived together at 255 Syracuse Avenue, Oswego, New York for over 50 years. During that entire period I have run our household and George worked outside our home with his brothers Harry and Bill at Northern Steel. Every day I have received the mail at our home and distributed it to those concerned. I would keep and manage the household bills and George would handle anything pertaining to Northern Steel or his other business pursuits.

2.      I have been told that the attached letter dated February 10, 2004 was mailed to our home address by the National Shopmen Pension Fund. I have never seen this letter and am sure it was never delivered to our house. If it had I would have remembered it because we never received any Northern Steel correspondence at our home.

sworn to before me
this 27th day of April, 2007

_____
Notary Public

JASON C. RINOLDO
Notary Public, State of New York
Appointed in County of Oswego
No. 01RI5050952
Commission Expires  10-23-09

*Corr*

# National Shopmen Pension Fund

Suite 400  •  1750 New York Avenue, N.W.  Washington, D.C. 20006-5301
Telephone No: (202) 383-4874  •  Fax No. (202) 628-6469

### VIA OVERNIGHT MAIL

February 10, 2004



Northern Steel Corporation
c/o George H. Caruso
255 Syracuse Avenue
Oswego, NY  13126-3130

Re:  Withdrawal Liability Determination and Demand for Payment:  Employer No. 450, SLU No. 612

Dear Sir or Madam:

The Trustees of the National Shopmen Pension Fund (hereafter "Fund") hereby notify you of Northern Steel Corporation's withdrawal liability to the Fund and demand payment thereof.  The Fund's records indicate that Northern Steel Corporation withdrew from the Fund as of October 2001.

The Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, requires that withdrawal liability be assessed against contributing employers who withdraw from the Fund after September 26, 1980 (29 U.S.C. Section 1381).  Withdrawal liability is determined by allocating a portion of the Fund's unfunded vested benefits ("UVBs") to the withdrawing employer pursuant to one of the methods authorized by ERISA. The method adopted by the Trustees of the Fund is the "attributable rule".  A withdrawn employer's liability under the attributable rule is the sum of:  (1)  the difference between the UVBs of its employees and its allocated share of the Fund's assets; and (2)  a proportional share of the Fund's UVBs that are not allocated to any contributing employer.  The Trustees of the Fund have directed the Fund's actuaries, The Segal Company, to calculate Northern Steel Corporation withdrawal liability.  The amount of the liability has been determined to be $5,397,100.  A copy of their assumptions used in this calculation is enclosed.

ERISA requires the Trustees to establish a schedule for the payment of withdrawal liability.  Annual payments are based on a statutory formula and are to be paid in equal monthly installments (with interest at an annual rate of 7.5%) over a period of years necessary to amortize the liability.  Northern Steel Corporation's repayment schedule, therefore, is as follows:  Employer is to pay $2,832.00 per month for 240 months.  The Fund hereby demands that you begin payment in accordance with the schedule no later than March 11, 2004. This repayment schedule will result in a total payment of only $679,680 of the full withdrawal liability. ERISA Section 4219 (c)(1)(B) limits the liability of the company to a twenty-year repayment plan. Accordingly, your company is not obligated to pay the full amount of the liability.  You may, if you wish, pay the entire amount due, without penalty.  Payments must be made notwithstanding any request for review of the withdrawal liability.

Document #: 17349



EXHIBIT
C

A withdrawn employer may, no later than 90 days after receipt of this letter, request a review of the determination, identify any inaccuracy in the Fund's determination of withdrawal liability which may exist, or furnish additional relevant information.

This letter constitutes notice of the withdrawal liability to Northern Steel Corporation. and all groups of trades or businesses under common control or common ownership with Northern Steel Corporation. The Fund hereby demands that you provide within 30 days the names, addresses, and officer names of any and all corporations, companies or entities within the common control group of Northern Steel Corporation or under common ownership of the stockholders of Northern Steel Corporation. Northern Steel Corporation is required to provide this information to the Fund within 30 days by 29 U.S.C. Section 1399.

If the Fund is required to bring suit to collect withdrawal liability, the withdrawn employer also becomes liable for interest, liquidated damages (in the amount of 20% of the amount due), and all costs of collection, including attorneys' fees.

We trust that payments will begin as scheduled. If you have any questions about this matter, do not hesitate to contact the Fund Office.

Sincerely,

A.H. Higgs, Jr.
Administrator

AHH/jw
enclosure
cc: Marc Rifkind, Fund Counsel ✓
SLU #612

| | |
|---|---|
| BOARD OF TRUSTEES,<br>NATIONAL SHOPMEN PENSION FUND,<br>ET AL | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| vs. | ) Civil Action No.05-cv-01479 |
| | ) (RWR) |
| NORTHERN STEEL CORP., ET AL | ) |
| | ) |
| Defendants | ) |
| | ) |

## ORDER

Before the Court is the motion for Summary Judgment filed by

Plaintiff, the Board of Trustees of the National Shopmen Pension Fund and

opposed by all Defendants; Finding that  there are genuine issues of

material facts and that Plaintiff is not entitled to judgment as a matter of

law, it is hereby ORDERED that said motion is Denied.


Dated: April 27, 2007


_____
UNITED STATES DISTRICT JUDGE