UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BOARD OF TRUSTEES, ) <br> NATIONAL SHOPMEN PENSION FUND ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> v. ) <br> NORTHERN STEEL CORP. et al., ) <br> ) <br> Defendants ) <br> _____ ) | Civil Action No. 05-1479 (JDS) <br><br><br><br><br> **MEMORANDUM OPINION AND** <br> **ORDER** |

**Introduction**

Presently before the Court is Plaintiff Board of Trustees, National Shopmen Pension Fund's (the "Fund") Motion for Summary Judgment. The Fund is a multiemployer pension plan. The Fund seeks to recover withdrawal liability sums under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). The Fund seeks recovery from Defendants Northern Steel Corp. (Northern), Oswego Amusements, Inc. (Oswego), GDR Enterprises of Oswego, Inc. (GDR), George Caruso, Jr., and Romao Caruso (collectively Defendants). The Fund requests the sum of $679,680.00 in withdrawal liability plus interest, liquidated damages, attorneys fees and costs as required by Section 502(g) of ERISA. Based on the Fund's assessment, Northern was to pay $2,832.00 per month for 240 months which would have resulted in a total payment of the full withdrawal liability. Plaintiff's Statement of Undisputed Material Facts (Pltf.'s Facts), ¶ 8.

Specifically, the Fund argues that Northern's withdrawal from the Fund in October, 2001

subjected it to withdrawal liability under ERISA. The Fund asserts that it properly provided notice to Northern which failed to timely request arbitration thereby causing withdrawal liability, as assessed by the Fund, to become due and owing. The Fund also argues that Oswego, GDR and the individual defendants are liable under alter ego and corporate veil piercing theories.

In turn, Defendants argue that Northern was not provided adequate notice of withdrawal liability and the corporate entities should be preserved.

On April 23, 2009, the Court held a hearing and is prepared to rule on the Fund's motion.

## **Standard**

Summary judgment, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ P. 56(c); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C.Cir.2006). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Id. at 895 quoting Anderson ,. at 248. An issue is "genuine" if the evidence could provide for a reasonable jury returning a verdict for the nonmoving party. *See* Id. When considering a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. The Court shall, "eschew making credibility determinations or weighing the evidence" on a motion for summary judgment. Czekalski v. Peters, 475 F.3d 360, 363 (D.C.Cir.2007).

However, a party opposing summary judgment must set forth more than mere

unsupported allegations or denials and the opposition must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the opposing party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson at 249-50; *see also* Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.' ") *(quoting* Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). To defeat a motion for summary judgment, a party must have more than "a scintilla of evidence to support his claims." Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C.Cir.2001).

## Discussion

**I. Statutory Scheme**

ERISA Sections 4201-4225, as amended by the MPPAA, Pub.L. No. 96-364, 94 Stat. 1208, 29 U.S.C. §§ 1381-1461, provides that if an employer withdraws from a multiemployer plan they must make withdrawal liability payments sufficient to cover that employer's share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391. "[T]he withdrawal liability payment requirement generally protects the financial integrity of multiemployer plans, prevents withdrawing employers from shifting their burdens to remaining employers, and eliminates an incentive for employers to flee underfunded pension plans." Nat'l Shopmen Pension Fund v. Disa, 583 F.Supp.2d 95, 99 (D.D.C.2008) *(citing* Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 416, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995);

Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 216, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 722-23, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)).

The steps for determining withdrawal liability are set forth by statute. Under the MPPAA, responsibility for assessing and collecting withdrawal liability is on the plan sponsor. 29 U.S.C . § 1382, § 1002(16)(B). ERISA Section 4219(b) mandates that the plan sponsor, "as soon as practicable" after an employer's withdrawal from the plan; (1) determine the employer's withdrawal liability; (2) prepare a statutorily-mandated schedule for payment of that liability in installments; (3) notify the employer of the amount of the liability and the payment schedule and; (4) demand payment in accordance with the schedule. 29 U.S.C. §§ 1382, 1399(b)(1). After calculating the withdrawal liability amount, the plan sponsor prepares a schedule for the payments by determining the "level annual payments" necessary to amortize the liability. 29 U.S.C. § 1399(c). ERISA further provides that "[a]ny dispute between an employer and the plan sponsor ... shall be resolved through arbitration," which a party may initiate within certain time periods. 29 U.S.C § 1401(a). Deadlines for the payment of withdrawal liability, plan sponsor review, and arbitration are triggered by notice and demand for payment to the employer. *See,* 29 U.S.C. § 1399(b)(2)(A) & (c)(2) (ERISA Sections 4219(b)(2)(A) & (c)(2)).

**II. Withdrawal Liability as to Northern**.

In this case, it appears undisputed that Northern withdrew from the Fund in October, 2001. The Fund asserts that it provided notice of the determination of withdrawal liability to Northern by letter dated September 30, 2003 and to George H. Caruso on February 10, 2004. The Fund administrator, A.H. Higgs, states that the Fund sent the September 30 letter by UPS, which made three delivery attempts to the last known address of Northern. *See* Supplemental

Declaration of A.H. Higgs (Sup. Dec.) ¶ 3.   The Fund asserts that after properly providing notice, Northern failed to make any of the quarterly payments, did not request plan sponsor review of the withdrawal liability payments and never attempted to initiate arbitration.  The Fund argues that the withdrawal liability it assessed is now due and owing from Northern.

Defendants claim that, prior to the instant lawsuit, Northern never received notice and therefore the statutory notice requirements were not met.

It is well settled that notice of withdrawal liability sent to one member of a controlled group constitutes notice to all members of that group.  *See* McDonald v. Centra, Inc., 946 F.2d 1059 (4th Cir. 1991); Connors v. Calvert Development Co., 622 F. Supp. 877 (D.D.C. 1985); O'Connor v. DeBolt Transfer, Inc., 737 F. Supp. 1430 (W.D. Pa. 1990).

Regardless of whether proper notice was issued in 2001, the Fund correctly points out that service of the present Complaint on August 4, 2005 constitutes valid notice under ERISA. The Fund argues that even if a factual question exists concerning its original notice to Defendants, they may not dispute that they received proper notice when they were served with the Complaint in this action. *See* Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 263 (2d Cir.1990) (finding that, regardless of original notice, defendant received valid notice when it was served with the complaint); *See also* Debreceni v. Merchants Terminal Corp., 740 F.Supp. 894, 900 (D.Mass.), aff'd, 889 F.2d 1 (1st Cir.1989) ( holding that filing of a lawsuit by multiemployer pension plan under ERISA provided participating employers with sufficient notice of default).  The Fund argues that because Defendants did not seek review and arbitration within 90 days of receipt of the Complaint the amounts became due and owing.

If arbitration is not initiated by the employer, the employer's withdrawal liability is "due and owing" according to the schedule set forth in the notice and demand. 29 U.S.C. § 1401(b)(1)

(ERISA Section 4221(b)(1)).  It appears undisputed that Northern did not request arbitration within 90 days following service of the Complaint.  The Court finds that Northern received valid notice by virtue of the Fund's Complaint.   Northern waived its right to arbitrate the withdrawal liability assessed by the Fund and all amounts assessed are due and owing.

**III. Liability as to Oswego Amusements, Inc., GDR Enterprises of Oswego, Inc**.

The Fund argues that Oswego Amusements and GDR are alter egos of Northern and, as such, should be held jointly and severally liable for amounts due.  Under ERISA, an alter ego liability theory enables ERISA trustees to "recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." Flynn v. R.C. Tile, 353 F.3d 953, 958 (D.C.Cir.2004). Alter ego liability, in the context of ERISA, "protects the federal interest in the solvency of multiemployer pension plans by enabling pension funds to recover delinquent contributions from an alter ego used to circumvent the participating employer's pension obligations." Id.  (*citing* Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 305 n. 3 (1st Cir.1998).

"In order to determine whether two businesses are alter egos, the court 'evaluates the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment and customers.'" Flynn v. Veazey Const. Corp., 424 F.Supp.2d 24, 33 (D.D.C.,2006) (*quoting* Flynn v. R.C. Tile, 353 F.3d 953, 958 (D.C. Cir.  2004)).   In support of a finding that Oswego and GDR were alter egos of Northern, the Fund recites the following undisputed facts:

> Defendant, Oswego Amusements, Inc. was in the business of owning and operating a speedway racing track.
>
> Both Northern Steel and Oswego Amusements, Inc. were wholly owned by George H. Caruso and his two brothers .... .

> George H. Caruso was president of both Northern Steel and Oswego
> Amusements, Inc.
>
> Oswego Amusements, Inc. and Northern Steel operated out of the same address.
>
> Over a period of years Northern Steel provided workers and materials to Oswego
> Amusements, Inc., and there was no agreement between the two companies for payment
> or repayment.
>
> In 1991, Harry Caruso's shares of stock in Oswego Amusements were redeemed.
> He received a note back from Oswego Amusements for $650,000, but the note was never
> repaid by the company.
>
> In 1992, George H. Caruso gifted his shares of stock in Oswego Amusements,
> Inc., to his three sons: George D. Caruso, Douglas Caruso, and Romao Caruso. He
> remained president of Oswego Amusements, Inc., and later served as Chairman of the
> Board.
>
> [I]n 1992, the three sons of George H. Caruso, established Oswego
> Speedway, Inc. to operated the speedway, while Oswego Amusements, Inc. remained the
> owner of the racetrack [].
>
> In 2000, Romao Caruso, on behalf of Oswego Amusements, Inc., and at the advice of
> counsel, drafted a note from Oswego Amusements, Inc. to Northern Steel for $500,000.
> This was to represent the labor and materials Northern Steel had supplied to Oswego
> Amusements over the years. The note was not negotiated with Northern Steel, and
> Northern Steel never demanded the note or payment on the Note. The Note was never
> repaid.
>
> Oswego Speedway, Inc. eventually became GDR Enterprises of Owego, Inc., ...
> Oswego Speedway, Inc. and GDR are one and the same.
>
> When Northern Steel ... was sold the proceeds in the amount of $240,848.00
> were deposited into the bank account of GDR.
>
> [W]hen the race track owned by Oswego Amusements was sold, proceeds
> in the amount of $344,831.95 were placed into an account owned by GDR.
>
> The only activity of GDR is to hold the money of Northern Steel and pay
> Northern Steel's insurance premiums.
>
> GDR is wholly owned by George D. Caruso, Douglas Caruso, and Romao
> Caruso. They are the Corporations [sic] only officers.

Pltf.'s Facts, ¶ 10-23 (internal citations omitted).

Defendants do not directly dispute the above facts, but rather maintain that although there were transactions between GDR, Oswego and Northern, there was, "strict financial accountability" regarding those matters. *See* Defendant's Statement of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, p. 4.  However, Defendants provide no compelling factual support for their position.  While denying alter ego status, Defendants admit that GDR is a "custodian" of cash assets of Northern and Oswego Amusements and claim that when there is a judgment against Northern they will turn over the assets upon an appropriate demand. Id. at 5.  Defendants make conclusory and largely unsupported statements that the ownership and management were separate.  Defendants' response to the alter-ego theory is unavailing.

Consequently, the Court finds that the above facts exhibit sufficient similarities between the enterprises in their ownership, management, business purpose and operations to support alter ego liability  as to Oswego Amusements, Inc., and GDR.

**IV. Corporate Veil Theory as to Individual Defendants.**

The Fund argues that the corporate veil ought to be pierced as to George Caruso Jr. and Romao Caruso.  In support, the Fund asserts that the Carusos completely controlled Northern by virtue of their ownership and management of GDR.

Generally, ERISA does not extend withdrawal liability to an individual corporate owner or officer absent a claim of alter ego or necessity to pierce the corporate veil. *See*  International Brotherhood of Painters v. George A. Kracher, Inc., 856 F.2d 1546 (D.C.Cir.1988).  Even when alter-ego and veil piercing theories are advanced, "courts have noted that where plaintiffs in an ERISA action fail to allege that individual defendants should be held personally liable under such principles, or fail to introduce evidence that would support such a basis for liability, such

claims must be dismissed." Connors v. P & M Coal Co., 801 F.2d 1373, 1378 (D.C.Cir.1986) (*citing* Operating Engineers Pension Trust, 726 F.2d at 515; Moyers v. Frank P. Bauer Marble Co., 556 F.Supp. 192, 194 (N.D.Ill.1983)).

In the instant case, the Fund neither alleged a basis for liability nor introduced any evidence that would support a summary judgment holding George Caruso Jr. and Romao Caruso personally liable for corporate obligations. The Court finds that aside from conclusory allegations of commingled assets and ownership and control of the companies, Plaintiff has not set forth facts which indicate the individual defendants used the business entities to defeat public convenience, justify wrong, protect fraud, or defend crime. *See* Francis O. Day Co. v. Shapiro, 267 F.2d 669, 673(D.C. Cir. 1959) (citation omitted). While there are supported allegations of commingled assets between the business entities, the record is largely devoid of such evidence as to the individual defendants[1]. Consequently, the request to pierce the corporate veil as to the individual defendants is, at best, premature in the context of a Rule 56 motion for summary judgment.

Accordingly, **IT IS ORDERED** that Plaintiff's motion for summary judgment [Doc. No. 37] is **GRANTED** as to Defendants Northern Steel Corp., Oswego Amusements, Inc. and GDR Enterprises of Oswego, Inc., and **DENIED** as to George Caruso Jr. and Romao Caruso.

---

[1] Plaintiff also argues that George Caruso Jr. and Romao Caruso should be liable for the corporation's debts under the corporate trust doctrine. However, as discussed above, Plaintiff does not provide the Court with sufficient facts suggesting that assets improperly inured to the individuals. A review of Plaintiff's Undisputed Facts does not evidence any assets distributed to George Caruso Jr. and Romao Caruso individually. Consequently, the Court declines to assess liability to the individual defendants on the record before it.

The Clerk of Court shall notify the parties of the making of this Order.

**DONE** and **DATED** this 28th day of September, 2009

/s/ Jack D. Shanstrom
_____
Jack D. Shanstrom
Senior United States District Judge